Mr. Spears, good morning to you. Welcome to the court. And welcome to Houston, Your Honor. Thank you. Please proceed. May it please the court. The district court in this case cited intrinsic evidence to construe the language defining the linkage groups in the ward patents, but on Applera's motion for summary judgment, the district court ruled that the linkage groups in the ward patents did not constitute a linkage group. Thank you. Please proceed. The district court relied on extrinsic evidence to hold the same language indefinite. Enzo is here today because the district court got it right the first time. Now, the ward patents are directed to polynucleotides that look and act just like natural materials, except that they've been tagged with a detectable label. In the claims of the ward patents, this label, A, is connected to the rest of the molecule by a linkage group. And instead of providing a structural definition of that linkage group, perhaps by a Marcouche recitation, the applicants in this case defined it functionally. They told the patent examiner that that was what they were doing, and the patent examiner withdrew in response to this an indefiniteness rejection that he had made against these very claims. Now, the examiner was correct in doing that because on at least three occasions, in the Barr case, in the Madison case, and the Johnson case, the CCPA allowed patent applicants to claim portions of the molecule using functional language. Counsel, isn't it the case that even if we agree with you that the summary judgment of invalidity for indefiniteness was wrong, that you also have to overcome the summary judgment of anticipation as to all the same patents? That's exactly right, Your Honor. There was a summary judgment of anticipation. You have to win on both, or we have to affirm. That's exactly right, Your Honor. Now, for a moment, let's suppose you persuade us on the indefiniteness invalidation. What was wrong with the anticipation invalidations? What was wrong was that the district court systematically chose to credit the testimony of defendant's expert over competent and reasoned testimony given by our expert. As a summary judgment movement, a plera had to prove by clear and convincing evidence that all of the limitations in the claims were satisfied in its prior art. Help me understand the most pinpointed conflicts between the one expert on the one side and the contrary expert on the other side that would show that there was a genuine dispute, obviously the summary judgment standard, a genuine conflict of testimony by battling expert. Obviously, that warrants a trial if it's real. I agree with that. What is it? Where does it reside? It resides in whether any of this prior art discloses molecules that are compatible with hybridization methodologies. Now, when we talk about hybridization, it's important to keep in mind what that is. I'm asking a question about the testimony. I want to know what portion of testimony by expert A conflicts with exactly what testimony by expert B so we can see how genuine a dispute there is on the facts. As to the PINJU prior art reference, Dr. Sherman pointed out disclosure in that reference that states when you take a transfer RNA, modify it, and mix it with a transfer RNA having a complementary anticodon, that no interaction can be detected. That is expressed disclosure in the reference that these molecules lack the functional requirements of the linkage group. Dr. Sherman not only cited that particular disclosure of PINJU, he explained why this was the case. He pointed out that the single bonds in the PINJU linking group... Don't go too far from the microphone because we're recording this argument. He pointed out that the single bond linkage groups in the PINJU reference do not have sufficient rigidity to avoid interference with hybridization. This opinion is also consistent with the disclosure of the patent, which clearly states that the preferred linkage groups... I thought the conflict was between the one expert and the other. You're telling us what the one expert said. What did the other expert say that was to the contrary? What the other expert did was to say, ah, these linkage groups in the PINJU and the CASI prior art, which was the other transfer RNA reference, are in fact the preferred linkage groups disclosed in the patent and would work. And there's the conflict. Now the problem with their expert's opinion is that the linkage groups in the CASI and PINJU reference aren't at all similar to the preferred linkage groups disclosed in the patent. Well, do we really need to find a problem with their expert or is it enough for us to conclude that there are genuine issues of fact, material fact, genuinely in dispute? That's the question that I think our chief judge is reaching for. And the answer to that question is no. You don't have to look at the reference and study it. All you have to do is see that there is a genuine issue of fact raised by the conflicting expert testimony. Now in this case... But it has to be a genuine issue. And, you know, the debate about whether a double bond is required or not, it seems to be undermined by the fact that the 824 patent, for example, shows a single bond. And not only shows it, but refers to it as a preferred embodiment, does it not? Respectfully, Judge Lynn, the patent does not disclose anything of the sort. What it states is that in the generally preferred materials, the linkage group has a double bond at the alpha position relative to base. Then the patent goes on to state that in more preferred embodiments, it also has a primary amine functionality. And then it provides a generalized structural representation of a primary amine. Now what a Plaris expert... And it discloses a single bond. Well... In that linkage group, right? Well, but you have to remember that that primary amine is provided to illustrate a feature of the more preferred linkage groups, which are a subset of the generally preferred linkage groups, all of which have a double bond in the alpha position. And what a Plaris expert did was to take that isolated structural disclosure and to compare it directly to the linkage groups in the Kasai and in the Pingxu prior art. And this type of finagling of the patent's disclosure for purposes of comparing it to the prior art is not clear in convincing evidence of anticipation. In fact, I think it's direct evidence of the opposite proposition. What about in the appendix at page 4318 and 4320? There's a declaration from Dr. Engelhardt where he says, paragraph 3, I make this declaration to illustrate various linkage groups that have been used in the laboratories of Enzo Biochem to link biotin to the 5-position of a deoxyuracil. And he says, exhibit A is a list of eight of these linkage groups that work. Right. And it seems to me that the last of the eight that are listed shows a single bond. That's exactly right. But that particular declaration is not directed to the generally preferred embodiments, which are clearly identified in the patent as having a linkage group at the alpha position relative to the base. But it says none of these linkage groups interfered with the ability of biotin, etc., etc. And that's at the heart of this issue, isn't it? That's exactly right. They didn't interfere with the detection system in the specific molecules that were tested for purpose of preparing that declaration. Now, you can't simply take that declaration and that eighth linkage group with a single bond and extrapolate a conclusion that the specific materials that Pingiu and Kusai were describing would not exhibit interference with hybridization if the same linkage group were used in those materials. And that's not even what a Plaris expert said. A Plaris expert did not cite that particular declaration before the patent office for purposes of comparing the linkage group in these references to the patent. Instead, what he did was to miscite the isolated bit in the specification illustrating the primary amine to essentially take it out of a context in which it is meant to illustrate an additional structural feature of a linkage group that includes these double bonds and then to go ahead and say, well, ah, these linkage groups, they're the same as the generally preferred linkage groups disclosed in the patent specification. So that deals with the two pieces of the transfer RNA prior art. With respect to the third piece of prior art, the Baumann reference, the most relevant disclosure in that reference is that if you take a nucleic acid and modify it to fluoresce, it is no longer capable of forming specific hybrids. So what Baumann did was essentially the opposite of what the Ward patents teach. He reacted his nucleotides with mercury. After that, he prepared his hybrid. And after that, he attached the detectable label to the resulting hybrid. Now, Dr. Sherman cited Baumann's own disclosure. And using that disclosure, he explained why the linkage groups in Baumann would not have survived a hybridization process if Baumann had attached his label before the molecule was hybridized. Which is basically the scheme that is contemplated in the Ward patents. Well, I have two questions for you in that regard. One, the claim is to a product, not a process. Yes. So what difference does it make whether the process might be different when the claim is to a product? The claim is to a product which has a linkage group that does not interfere with hybridization. That gets to my second question. Is the claim related to interference with hybridization or simply interference with the detection of the molecule A? It's both, Your Honor. The linkage group interferes neither with the ability of the molecule to hybridize nor with A to be detected. I know that that was the district court's claim construction. Because the district court made that claim construction with the phrase not interfering substantially, et cetera, and applied it to all of the patents. But independent from that sort of generic claim construction, the claims actually in the patent are not directed to hybridization, correct? For the 824 and the 767. For the 928. But the 928, the court is exactly correct. That claim does not mention hybridization in the context of the functional definition of the linkage group. So even though the district court sort of glossed over it or glommed all of these things together or conflated all of this in one discussion, the fact remains that the patent doesn't call for the absence of interference with hybridization, simply the absence of interference with the ability to detect molecule A. And isn't that enough based on Baumann? Your reading of the patent is exactly correct. And there's a reason that the district court conflated all of these claims. The district court was invited to do so by both parties. Both parties argued for a common construction of this claim language. None of the parties to this appeal are arguing that the claim language ought to be construed differently. Now, there is a slight twist to the 928 patent. Does that mean that you can thereby sort of engraft the hybridization issue onto the claim to survive a challenge on validity? There is a twist in the 928 patent that isn't in the 824 and the 767. The 928 patent in the preamble claims compositions that are suitable for hybridization assays or words to that effect. I can't remember what it exactly is. But that sort of functional language in the preamble arguably would be a reason to import a hybridization requirement on the functional language defining the linking group. And that may very well be why the parties to this case have consistently argued for a common construction of all of these ward patents. Mr. Spears, I want to go back to something a philosophy major can understand. Let's go back to the beginning of the argument, which was the question of the indefiniteness issue. Let's assume hypothetically that for whatever reason, whether it's because we conclude there are material issues of fact that should not have been decided on summary judgment or we disagree with the claim or whatever reasons, we send the case back. What should we then do about the indefiniteness issue? For example, candidly, I'm troubled by our indefiniteness law because the statute requires that claims be clearly, I don't have the exact words in front of me, but clearly indefinitely described. But then we turn around and we say, we have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness. Rather, what we have asked is that the claims be amenable to construction, however difficult that task may be. If a claim is insolubly ambiguous and no narrowing construction can properly be adopted, we have held the claim indefinite. That strikes me as not consistent with the statutory requirement that the invention be definitely claimed. If we should send this back for further trial, would you agree that we need to be a little more consistent with the statute, or do you require something more for definiteness than simply that the claim has to be absolutely incomprehensible before it can be held to be indefinite? Or do you like the current standard? And related to that, in your brief you ask us to, if nothing else, at least narrow the claim so that it can be upheld as definite. Could we narrow it by saying, you wrote it, you establish why it's definite, instead of having it the other way around? Okay. Your first question first. The portion of law that you just read is actually informed by the patent statute, not by Section 112, but by the statutory presumption of validity. The statutory presumption of validity is why this court basically bends over backwards and only finds indefiniteness as kind of a last resort if there's no reasonable construction available. But you appreciate that that's purely circular. That is to say, the statutory requirement that a patent be presumed valid doesn't mean that an invalid claim should be upheld as valid just because we think it can't be shown otherwise. What I read that case law as is essentially this court trying to grapple with that there's a statutory presumption of validity that applies to a question of law. So what does that mean? It's a question of law, yet there's a presumption of validity. So the way the court has resolved that tension is to say, well, this means we're going to do our best to try to construe this language. And only if we can't will we say that the presumption is rebutted and invalidate that. What do you think of that? I think that's a perfectly reasonable approach. Now, that sort of ties into the second question that you raised regarding what we propose by way of an appropriate limiting construction in this case. Specifically, we indicated that rather than hold this patent invalid, there is certainly adequate disclosure of the structural requirements of the generally preferred linkage group and the patent could be construed accordingly. One way of getting there is obviously to disregard what the applicants told the patent office and to construe this as a 112.6 limitation. If you do it that way, you get to the result we mentioned in our brief. But isn't our precedent, if it's ambiguous with respect to indefiniteness, is it not at least clear that we don't rewrite claims to preserve validity? Well, what Judge Plager just read is language that appears in at least a half dozen of these courts' cases. Now, this court has never taken the next step and said, oh, in this case in front of us, here's what we said the law is. In applying this law, we are going to arrive at this construction to save the validity of this patent. The court has never done this. If the court does it in this case, it would probably be the first time that it has. Generally, we conclude that there is more than one interpretation that would be valid. And then in deciding which of those two perhaps conflicting interpretations is the appropriate one, we look to the one that preserves validity. Are you conceding that it's invalid, it's indefinite if it's given the broad construction? Absolutely not. You're saying it's still valid, but if we have any doubt, we should narrow it in accordance with your suggestion. That's exactly right. In light of the objective criteria and exemplary disclosure, this patent is perfectly definite as construed by the district court. So you think there's an obligation on us to do what you could not do, which is come up with clear enough claims so that a competitor would understand the boundaries of your claim? Respectfully, Judge Plager, these claims are as clear as the subject matter will allow. They are as clear as claims that had been upheld by the CCPA in the Barr, Madison, and Johnson cases. And I think that the only reason the district court reached a different conclusion is by applying a numerical standard to irrelevant extrinsic evidence. So if judges can't understand these kinds of claims, maybe we should just rule them not patentable. The district court understood this claim when asked to construe it. It's only on de Plager's motion for judgment of invalidity when the district court got led down this numerical standard rabbit trail that the court found indefiniteness. And quite frankly, there are very few patents that would survive if held to that standard. Of course, you understand that as a panel, not being the full court, that we can't overrule any of the precedents that are being discussed. And I don't understand either side to be urging us to not adjudicate the case but instead request the full court to start all over again, right? That's exactly right. There's been no such request. Let's hear from the other side then. Mr. Groombridge. Thank you, Your Honor. I'd like to start off by talking about indefiniteness. And what I'd like to start off by saying is that for five years, we've been looking, litigating this case, looking for an answer to the question of how do I know whether interference is or is not substantial. We still don't have one. And the district court asked Enzo's counsel that exact question. I would invite this court to look at it. It's in the record at 7500 to 7502. And this was the way the question went. The district court said, can you have interference but less than substantial interference? That's a slight paraphrase. Can it interfere but still not be substantial? In the middle of the page on 7500. Answer of Enzo's counsel, absolutely. And that's not an accident because that was the key to their infringement position. They said for infringement, oh, there's interference but it still infringes because it's not substantial. Term and degree. On prior art, they said there's no invalidity, and we just heard this repeated, because there is interference and it is substantial. All we want is the public notice function of these claims to work and say, tell me how I know. After five years of litigation, rounds upon rounds of briefing in the district court, briefing in this court, still there is no answer to that question. There's a lot of cloudiness about, oh, it's in the patent. It's in there somewhere. A skilled person would understand. This is wrong. This is wrong. There is no affirmative answer. Tell me how I know. It's a term of degree. You're not saying that the claims have to set forth a right-line boundary? Absolutely not. No, no. I think the law, and in answer to the Chief Judge's question, we do not seek any change in the law of indefiniteness in this case.  And the patents speak to those of ordinary skill in the art? Absolutely. And we have in the specification itself some guidance as to what the bounds are? That latter part I disagree with. Isn't that what, for example, in Column 18, the end of Column 18 of the 824 patent, there's some guidance there about the modified polynucleotides of this invention are capable of denaturation and renaturation under conditions compatible with their use as hybridization probes? And it goes on from there and specifies some parameters with respect to the melting point and even provides some wiggle room there of, you know, 15 degrees or so as to whether these are effective or whether they interfere with hybridization or interfere with the label. I don't think, Your Honour, that provides a standard and I'd illustrate this by reference to the accused product in this case. The accused product is a single nucleotide with a linker and the question is does the linker cause substantial interference? The way it's used in DNA sequencing is with an enzyme to join up with other molecules and create a ladder of different pieces of nucleic acid of different lengths. Now, it's entirely possible, and this is one of the things the District Court relied on, that in a short molecule that linker could cause interference and in a longer molecule it won't cause interference. And yes, there are certain conditions. We were the first ones to... But wouldn't those of ordinary skill in the art, and I don't mean to interrupt, but wouldn't those of ordinary skill in the art sort of appreciate that and be able to make a decision as to whether there is substantial interference or not? No, and I speak as the person who asked these questions in the depositions in this case. How do we know the answer? And the answer we could never, ever get from any single witness in this case, a straight answer to that question because it's just too complicated. Yes, you can look at... It seems to me that I used to litigate patent cases way back when, so I understand how this works. And I think it's that there was obviously an effort to press the witnesses on the basis of some definitive boundaries and some yes or no, or what is it? Is it 10 percent? Is it 15 percent? How about in all cases, some cases? But in all fairness, the question is whether one of ordinary skill in the art would understand what the parameters are, what the basic mileposts might be in this claim. Well, Your Honor, I'd say I disagree that there was an effort to press them. And I don't mean to suggest there was something pejorative or improper going on. I'm just saying that the nature of the game of litigation, that sort of characterizes a lot of what transpired. Nor did I take it that way, Your Honor. But what was going on was to say, look, we don't care what test you want to tell us to use. We're happy. We'll either use it for invalidity and say your claims are invalid over the art, or we'll use it for infringement and say we don't infringe. But we've got to have a test. We've got to have some way of knowing the answer. And you can't just say, oh, it's in there. It's like soup. It's in there somewhere. And with most respect, I would direct Your Honor to the question when their infringement expert, and they had two experts. The infringement expert had never met something that was not covered by the claim, and the validity expert had never met something that was covered by the claim on this issue. When the infringement expert, Dr. Sindon, was asked, I asked him the question, okay, you're telling me there are degrees of interference. How do I know? Not 5%, 10%, 15%. Just tell me. Open end of question. How do I know whether it's substantial or not? The microphone's yours. Tell me. What relevance is it that there may be disagreements among experts with respect to an issue? That's a question of law. Well, but if we're going to say what do persons of skill understand, how are we to answer that without reference to an expert just as in a markman proceeding? Well, but you see, it seems to me that if you can find a legitimate expert who can be seen as someone of ordinary skill in the art, who can come forward and say, in reasonably good faith, I know what this means. It seems to me that under our current standard of indefiniteness, you must lose. Because the only way we will agree with you under our current standard, and that is our law, as our chief judge has pointed out, is we have to conclude that the claim is insolubly ambiguous. I understand insolubly to mean that there is no possible way that ambiguity can be resolved. And if you can find legitimate experts willing to say, oh, we understand this, and as Mr. Spears pointed out, he likes that standard, it seems to me he has to win on the indefiniteness argument, doesn't he? I don't agree with that. If you could find a legitimate expert who would say, I understand this, and would then offer a principled explanation, perhaps that answer would flow. If you find a legitimate expert who says, trust me on this, I understand it, but I'm not going to explain it to you because I can't, and that's what happened in this case twice, then I submit that you cannot, as a patent owner, avoid a holding of indefiniteness simply by virtue of finding an expert who is willing to say, trust me, it's clear, even though I can't explain it. And that's what happened here with both of their technical experts. Remember, these are their experts, not our experts. We are not going out and finding someone and paying that person money to say, oh, it's indefinite. They're experts who are the people with the most incentive in the world to tell us how it's definite and to answer that question, and yet they still can't. And again, Judge Lynn, I would direct Your Honour to the place where this question was asked, and in the record at A, 1768, to say, how do I know? And the answer is, that's difficult to answer. And then there's a discussion that goes on, but that's really the key to this. It's difficult to answer. It's in the hands of the experimenter. Nobody would know. It may vary from person to person. It can't be overly difficult. Well, how difficult is overly difficult? Well, that means different things to different people. And I stand before you and say, for five years we have litigated this, and we've just asked for an answer to this question. We still don't have one. And that, to me, is the clearest possible evidence of a patent that is insolubly ambiguous. And I'm happy to answer more questions, but that's the nub of the problem on indefiniteness. This is one where not only did they create the indefiniteness when they wrote the claims, but they affirmatively embraced it in the litigation in order to try to have it both ways. How about anticipation? Because time is beginning to run short. And I apologize. I will move on. On anticipation, I think the issue is this. I disagree with Mr. Spear's remarks regarding what the patents say, and I would point out the question really, first of all, I think for anticipation, the court need only look at two references, Kasai with respect to the 824 and 767 patents and Baumann with respect to the 928 patent, and I'll deal with those in turn. As to Kasai, the question boils down just to this. Does the linkage group cause substantial interference, yes or no? And Kasai has the linkage group, which is CH2NH. That's disclosed in the patent. It's not an accident because we went out and looked for prior art that had that linkage group. Mr. Spear argues that a double bond is required. Well, I'll just read. I think Your Honor already covered that ground in Your Honor's questions, but I would say it's certainly clear looking at the 824 patent at the bottom of Column 8, it specifically says that any of the well-known bonds including carbon-carbon single bonds, carbon-nitrogen single bonds, and it goes on, can be used. It's generally preferred to have an olefinic bond. It says that. That's certainly true. Then at the top of Column 9, it says, it is even more preferred that the chemical linkage be derived from a primary amine and have the structure CH2NH. And have the structure CH2NH. Now, this argument of no anticipation is saying, well, when the patent says it have that structure, that's a terrible mistake. It can't have that. If the prior art has that, well, we've got to rewrite the claim somehow. And this idea that we could rewrite it to require a double bond or in their earlier iteration a multiple bond is inconsistent with the patent itself. It's inconsistent with the file history including most particularly the declaration and item number 8 in the list of compounds which has no double bonds. In the prosecution and in the written description, they've said over and over again, don't need double bonds. And this is, I would submit, the exact same issue that came up in the Halliburton v. MI case where there was an attempt to narrow the claims by referring to a particular embodiment. That's not appropriate. That's not what these claims mean. And on anticipation, it boils down to that. As far as the issue of fact, and the court asked Mr. Spears to point out to me the issue of fact. I would like to do that. I'd like to point out the issue of fact. We submitted, in our motion for summary judgment, a detailed expert declaration going through every aspect of this with 100 pages of claim charts. And they're in the record, 1478 to 1577, should the court care. On Kasai, the response is two sentences. The head-to-head dispute of fact is two sentences. And this, A2071, paragraph 44 of their expert's declaration where he says, and it's at the bottom of paragraph 44, even if one were to assume the aminomethyl group served as a linker arm, that aminomethyl group's the same group we were just talking about as being preferred in the patent, the aminomethyl group would not provide sufficient rigidity to prevent significant interference with hybridization of a complementary polynucleotide. Indeed, one would predict,  and concomitant high degree of motion, there would be significant interference due to free rotation about single bonds. Now, if that be sufficient to raise an issue of fact, then there is an issue of fact. We think it's not sufficient. We don't think you can contradict the patent specification and provide no explanation for the contradiction. Not even refer to what the patent says and just say, trust me again, this bond, yes, I know it's disclosed as a preferred structure in the patent, but I'm going to tell you it doesn't work for the purposes of the patent. I'm not going to explain why. I'm just going to say those two sentences, which one would predict, create an issue of fact. And in our view, the district court was entirely correct. You can't create an issue of fact by simply saying, without explanation, patent's wrong. I don't agree with that. And this, again, it exemplifies what's wrong in this case. Now, I'll talk finally about the Bauman reference. Again, Bauman, the court is entirely correct. Bauman's composition of matter. There are only two claims that issue claims one and two. Bauman discloses a molecule, which on its face looks just like the structures in those claims. So we come back again, yet again, the question of the only dispute of fact is, is that molecule, which has a structure that maps one-to-one to the structure in the claims, does it or does it not cause substantial interference with hybridization and detection? Does the linker arm cause that? And here, the issue distills down to the following. The purported issue of fact that was raised was to say the structure in Bauman has a mercury linkage. And mercury linkage, under certain circumstances, may be labile. It may break under heat or certain types of acidity, for example. And so their expert says, well, that won't work, won't meet the claim limitations because this linkage is just not robust enough. But Bauman itself says, and again in the record, Bauman says, and this is at A2708, that you can avoid the loss, the breakage of those mercury linkages by controlling temperature and what buffers you use. So Bauman gives you the express guidance for how to avoid this problem that is allegedly creating the issue of fact. Is interference with hybridization an issue with Bauman? Our view, Your Honour, is no because for the exact reason that Your Honour articulated in the question, it's a molecule, it's a composition of matter. Then why wasn't there some objection to the district courts sort of considering and interpreting the phrase with regard to both interference with hybridization and interference with the indication as applying to all of these claims? Why wasn't there some objection? There was an objection, Your Honour. We argued at the markman stage of the case that certain claims of certain patents did not include such a requirement. We lost on that issue. The district court essentially said I think they do and so we went forward on that basis. Mr. Groombridge, just on the overall mapping of the case, we started out with six patents. One ward patent was abandoned at some point so we have three ward patents and two other patents. Potentially left in this case are four patents, three from the ward family and one unrelated patent. The last unrelated patent has been dropped based on the markman rule. How is it that we went from a lack of a final judgment that was appealable to this judgment being final enough to be appealable? What did the district court do with other patents on the remand that cured the problem? The remand from the prior proceedings before this court? Yes. The parties agreed to a form of judgment which everyone accepted was indisputably final. The district court entered that judgment and then ENSO filed the new notice of appeal. What did the judgment essentially say? The judgment said that, and I'll paraphrase, I don't recall it exactly, but ENSO has desisted from its claims under one of the ward patents and the counterclaims are thereby mooted so that one is now gone. In fairness, I would say ENSO gave us a covenant not to sue on that ward patent. As to the other three ward patents, the court has determined that they are invalid. As to the Braekel 830 patent, ENSO has conceded it cannot prove infringement under the claim construction that the court adopted and therefore the parties have stipulated  But that claim construction is before us. As to the final patent, ENSO dropped its allegations of infringement without prejudice. There was a dispute as to the significance of the claim construction but eventually we resolved that by saying, look, let's just let it go and it will probably never come back and I'd be very surprised if it ever did come back. So that's the procedural posture. If there be any questions on the 830, I would be happy to address them. All right, thank you. We'll have a rebuttal. Mr. Spears. By way of clarification, the initial judgment was not final because the 955 patent had neither been adjudicated invalid or not infringed and it was on that basis that a remand was needed in order to clear up everything. The stipulated final judgment that disposes of everything appears at page 118 and page 119 of the record. Now, this is not a case where the public notice function of patents has been derogated. A Plera's own lawyer received a copy of the claims to be allowed in the 767 patent. He read them. He understood what they covered. He knew they covered their products. He wrote the patent office to complain. So at least with respect to Mr. Makovich, these claims are sufficiently definite to inform the public of the scope of the patent protection that ENSO sought and that ENSO obtained. Now, Mr. Groombage questioned how he is supposed to go about applying these claims to prior art and that's a very good question and I think that question illustrates why his proofs on summary judgment were defective. It was their burden to provide clear and convincing evidence that the prior art molecules were either compatible with hybridization methodologies. They could have done that with express disclosure in the reference or they could have made the molecules and done the experiment. There's been no experimental evidence in this case. So for a PLERA to prove anticipation, there has to be express disclosure in the reference that the modified polynucleotides are compatible with DNA hybridization methodologies and there is no such disclosure. Our expert raised genuine issues of disputed fact both with respect to the Casai reference and with respect to the Baumann reference. Mr. Groombridge reviewed the portion of his declaration addressing the unsuitability of the Casai linkage groups for these hybridization methodologies based on their lack of rigidity. But additionally, and I quote from page 2440 of the record, Dr. Sherman also provided the following opinion. Dr. Kricka also alleges that Casai discloses the fluorescently labeled tRNA tier can be used to detect the presence of the nucleic acids and goes on to identify them in a sample. However, the interaction between supposedly densulated pre-Q1 tRNA tier did not involve hybridization by complementary strands of polynucleotides. Rather, it involved stimulated ribosomes. So here is Dr. Sherman stating a reasoned opinion that nothing in the reference discloses what the claims require with this functional language, i.e., compatibility with hybridization. He identifies this defect in the reference disclosure and he goes on to explain it by pointing out how the linkage groups in this reference are unsuitable for these types of applications. With respect to Baumann, is there any dispute that a ribosomal RNA is a type of polynucleotide referred to in these patents? There is no dispute of that whatsoever. But that undermines the testimony you just read? No, it doesn't. A ribosome has both proteins and ribosomal RNA. It was their burden of proof to demonstrate that the specific interaction reported in CASI was an interaction between the transfer RNA and a complementary sequence. That's the definition of hybridization that the district court gave and it's a definition that all of the parties accepted. All that CASI reported is what happened when you mix up these transfer RNAs with ribosomes. With respect to what he did report, there actually was some interference because the modified materials were only two-thirds as effective at sticking to ribosomes as the native materials. Now, I won't bother to waste this court's time reading from Dr. Sherman's declaration addressing the Baumann reference, but there is, as with CASI, a detailed and reasoned opinion that appears on page 2447 of the record in paragraph 74 in which Dr. Sherman does explain why the Baumann reference doesn't disclose the invention, why it doesn't disclose linkage groups that are compatible with the hybridization process. And unless the court has any further questions, I have nothing more. Thank you.